Filed 2/22/16  Estate of Kinerson CA

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| Estate of LARRY E. KINERSON, Deceased. | |
| SYLVIA KINERSON,<br><br>  Petitioner and Appellant,<br><br>  v.<br><br>MICK KINERSON, as Administrator, etc.,<br><br>  Objector and Respondent. | F070309<br><br>(Super. Ct. No. PR000345)<br><br>**OPINION** |

        APPEAL from a judgment of the Superior Court of Merced County.  Brian L. McCabe, Judge.

        Cyril Lawrence, Inc. and Cyril L. Lawrence for Petitioner and Appellant.

        Damrell, Nelson, Schrimp, Pallios, Pacher & Silva, Fred A. Silva and Maria Fatima Gioletti for Objector and Respondent.

-ooOoo-

Appellant Sylvia Kinerson (Sylvia) is the surviving spouse of Larry Kinerson. Respondent Mick Kinerson (Mick) is her stepson and the administrator of his father's estate. Sylvia and Mick disagree over whether certain vehicles (including classic cars), shop tools and household furnishings belong to Sylvia or to Larry's estate.

The trial court ruled that four vehicles, a car lift and the shop tools were the property of the estate and that a 1950 Mercury, a 1983 Tommy trailer, and certain household furnishings were owned in equal shares by the estate and Sylvia. The court's findings regarding ownership were based on its determination that an antenuptial agreement was valid and expressed Sylvia and Larry's intent that the money and assets each acquired during the marriage would remain separate property and, thus, no community property would be created during the marriage. The court also determined the estate was entitled to its costs and reasonable attorney fees pursuant to Probate Code section 859.[1]

Sylvia appealed, contending the trial court erred on 10 separate grounds. We conclude the trial court properly determined the antenuptial agreement precluded the creation of community property during the marriage and properly handled the presumption of title created by the Vehicle Code sections that address the legal effect of the wording of vehicle title and registration documents. Also, we conclude there was sufficient evidentiary support for the trial court's findings of fact regarding (1) the tracing of the separate property of the spouses, (2) Sylvia's contributions to the restoration of vehicles, and (3) witness credibility. On a procedural issue, we conclude the trial court did not abuse its discretion in treating Sylvia's spousal property petition under section 13650 as a petition brought under section 850 once the court concluded there was no community property. As to evidentiary issues, we conclude the trial court did not abuse its discretion in admitting evidence over Sylvia's relevancy and Evidence Code section

---

[1] All unlabeled statutory references are to the Probate Code.

352 objections. Lastly, we conclude the issue of Mick's entitlement to attorney fees is not ripe for appellate review because the trial court has yet to award a specific amount of fees.

We therefore affirm the judgment.

## FACTS

Sylvia was born in 1938 or 1939. She married Albert Laffranchini in November 1954. Sylvia testified that he was an excellent mechanic, they restored a number of cars during the marriage, she worked side by side with him on the cars, and she "chased for the parts." During that marriage, Sylvia went to work for Manteca Ford, where she "started off being a parts chaser" and "ended up being parts manager." The marriage produced her only child, Stanley Laffranchini, and ended in divorce after 17 years.[2]

In May 1989, Sylvia met Lawrence Edward Kinerson (Larry) at a friend's 50th birthday party. They shared an interest in older automobiles. At the time, Larry worked as the foreman in Bonander Pontiac's body shop.

On August 18, 1990, Sylvia and Larry were married. They signed an antenuptial agreement the day before. At the time, Sylvia owned a house on Ebbetts Street in Manteca, California as her separate property and Larry owned a house on Bloss Avenue in Delhi, California as his separate property. Early in the marriage, they lived in Sylvia's house in Manteca. Sylvia handled the finances during the marriage, which included joint checking and savings accounts opened shortly after their marriage. Common expenses, such as utility bills and food, were paid from the joint accounts.

---

[2] Stanley married in 1979 and separated from his wife Elizabeth in 1997. The dissolution of that marriage was final on December 31, 1998. They had three daughters—Teresa (1981), Angela (1983) and Antoinette (1986). In evaluating the testimony of these individuals, the court found there was a family rift with Sylvia, Stanley and Teresa aligning on one side and Elizabeth, Angela and Antoinette on the other. The latter witnesses presented testimony that refuted Sylvia's version of events.

3.

In 1992 or 1993, Sylvia stopped working—she had worked for about 20 years as a parts manager for Dana Corporation—and began receiving disability. Larry worked for Bonander Pontiac until the mid-1990's and then began receiving social security benefits. Larry's social security payments and Sylvia's disability payments and, later, her social security payments were deposited into their joint checking account.

Sometime around 1994 or 1995, Larry and Sylvia moved from Sylvia's house in Manteca to Larry's house in Delhi. The Delhi property included a pole barn that had been modified with interior walls and functioned as Larry's shop. The shop was large and included a paint booth.

Larry was talented and skilled at the restoration of vehicles and used the shop for restoration work. People brought vehicles to Larry to be customized for a price or Larry would buy a vehicle, restore it and then sell it. Larry restored numerous vehicles during the 19-year marriage and resold some for a considerable profit. Generally, the income generated by Larry's work on vehicles (whether cash or barter) was not reported for tax purposes. The trial court found "the unreported custom work performed over the years by [Larry] produced significant income each year, particularly the last 15 years of the marriage." Larry and Sylvia did report the payments Larry received from Clark's Pest Control for body work on their trucks. For example, their tax returns from 2005, 2006 and 2007 showed that the work from Clark's Pest Control produced gross receipts of $4,939, $6,173, and $1,840, respectively.

On September 9, 2009, Larry filed a petition for dissolution of marriage that listed August 18, 2009, as the date of separation. Larry's attorney testified that Larry told him he needed a divorce because he felt that "his wife was moving things out and transferring things and hiding things". Larry told his attorney he did not understand their finances, which Sylvia handled, and that he had asked about the finances and was very concerned about what she was not telling him.

4.

Larry also requested his attorney obtain a restraining order against Sylvia and asked if she could be evicted from his house in Delhi. One reason Larry gave his attorney for being afraid of Sylvia was that she might call the police and make false accusations against him. Larry told his attorney the police had been called a couple of times and he felt it would be safer for him to stay in a little trailer by his shop.

On November 7, 2009, less than two months after filing the petition for dissolution of marriage, Larry died. Mick was Larry's only surviving child.

One dispute in this case involves the extent of Sylvia's gambling and her use of funds from the joint bank accounts to pay for her gambling. One of Sylvia's granddaughters testified that Sylvia went gambling twice a week. Sylvia testified that the joint checking account was used for her and Larry's gambling. It appears the trial court impliedly found that Larry's gambling expenditures were minimal and Sylvia's were significant. In addition, a form W-2G showed that Sylvia had gross winnings of $1,386.60 from a slot machine at the Black Oak Casino on August 16, 2005. A 2009 tax return reported $3,151 in gambling income won by Sylvia. There was no record of these winnings being deposited back into one of the joint bank accounts.

Another dispute concerns whether Sylvia diverted money Larry earned doing restoration work from the joint bank accounts to accounts held in her name or held jointly with her son. The trial court addressed this dispute by finding that "Sylvia deposited, withdrew, transferred, opened and closed accounts in a systematic manner of shifting assets to various accounts for the benefit of others outside the marriage."

## PROCEEDINGS

Less than six months after Larry's death, Mick filed a petition for letters of administration of Larry's estate. Over Sylvia's objection, Mick was appointed the administrator of the estate in July 2010.

In August 2010, Sylvia filed a spousal property petition requesting an order that certain assets belonged to Sylvia. The assets included (1) a 1956 Chevy panel van; (2) a 1950 Mercury; (3) a 1983 Tommy trailer; (4) a 1933 Ford roadster; (5) a 1984 motor home; (6) a 2004 GMC Sierra; (7) household furnishings and furniture; and (8) Larry's shop tools. Sylvia's petition asserted the assets were either her separate property or community property of the marriage that would pass solely to her as the surviving spouse.

Mick opposed Sylvia's petition, asserting that an antenuptial agreement signed by Sylvia and Larry provided the estate with a competing claim of ownership to the assets mentioned in Sylvia's petition. The antenuptial agreement is described in detail in part I.A, *post*. In November 2010, Sylvia filed an amended petition that included a history of the purchase or acquisition of each vehicle listed in her petition.[3] For example, Sylvia asserted that she sold her 1963 Ford Thunderbird and the money was used to buy the 1950 Mercury and 1983 Tommy trailer from Albert Neilson.[4] Sylvia also asserted the 1933 Ford roadster was purchased with community property funds in July 2004.

The litigation produced a May 2011 ruling on the validity of the antenuptial agreement and a lengthy tentative ruling in September 2012. In February 2013, Mick filed a section 850 petition relating to certain assets that he claimed should be part of the estate. Mick's petition listed (1) four bank transfers totaling approximately $350,000, (2) a tractor sold by Sylvia after Larry's death, and (3) missing tools. Sylvia opposed Mick's petition.

---

[3]   Sylvia used mandatory Judicial Council form DE-221 (rev. Jan. 1, 2005) for her petition and the amended petition.

[4]   In November 2013, Sylvia testified that she traded her Thunderbird for a black Corvette, which was subsequently traded to Neilson for the 1950 Mercury, the Tommy trailer and some cash.

In November and December 2013, the trial court held eight days of evidentiary hearings. The court issued a proposed statement of decision in May 2014. Sylvia filed objections to the proposed statement of decision, which did not convince the trial court to alter its conclusions.

On July 10, 2014, the trial court filed its judgment. The court determined that the antenuptial agreement precluded the creation of community property and, as a result, the income generated by the labor and effort Larry expended on the restorations was his separate property. As to the separate property funds that Sylvia and Larry contributed to their joint bank accounts, the court concluded the antenuptial agreement meant there was no presumption that commingling of funds created community property and, furthermore, the act of commingling did not modify the agreement.

The court explicitly addressed the credibility of the witnesses who testified at the hearing. The court found the testimony of Sylvia, her son Stanley and her granddaughter Teresa was not credible. In contrast, the court found Stanley's ex-wife, Sylvia's other two granddaughters, Mick, Larry's divorce attorney, and Larry's friends were credible witnesses.

As to specific assets, the trial court found that the 1933 Ford roadster, the 1984 motor home, the 2004 GMC Sierra truck, the Direct-Lift Pro-Park 7, and the 1956 Chevy panel van once owned by his predeceased son were Larry's separate property. Consequently, upon Larry's death, this property became the separate property of his estate. The court also found that a tractor Sylvia sold for $1,200 after Larry's death was property of the estate and required Sylvia to pay that sum to the estate. As to the 1950 Mercury, the 1983 Tommy trailer, and the disputed items of household furnishings at the house in Delhi, the court determined those assets were owned in equal shares by Sylvia and the estate.

7.

After the judgment, Mick filed a memorandum of costs seeking approximately $44,700. Sylvia filed a motion to tax costs. In August 2014, the trial court granted the motion in part, allowing Mick to recover costs totaling $11,278.20. No order was issued awarding a specific amount of attorney fees, although the declaration filed in support of Mick's request for attorney fees and costs requested $409,283 in fees.

In September 2014, Sylvia filed a notice of appeal.

## DISCUSSION

Sylvia's opening brief summarizes her position regarding the contested vehicles by stating that she "has always maintained that, except for those vehicles traceable to her separate property, the vehicles were jointly held as community property bought and restored with monies from their commingled accounts." Sylvia also contends the funds commingled in their joint bank accounts were community property. Sylvia's arguments about community property and her separate property are reflected in her request for relief on appeal, which "asks this court [to] reverse the trial court findings and find the assets listed in her petition [are] either community property assets of the marriage passing to her as the surviving spouse or her separate property by virtue of direct tracing."

For organizational purposes, the issues relating to community property are addressed first, followed by the issues relating to separate property and Sylvia's claims of procedural and evidentiary error.

## I.  ANTENUPTIAL AGREEMENT

The antenuptial agreement plays a significant role in determining whether the property owned by Larry and Sylvia was community property or their separate property. Consequently, the first topic we address is the meaning and effect of the antenuptial agreement.

8.

A.  Contents of the Antenuptial Agreement

The antenuptial agreement signed by Sylvia and Larry is dated August 17, 1990, the day before their marriage.  The agreement included the following stipulation relating to the parties' intentions about separate and community property:

"c.  Intent to Define Property Rights of Parties after Marriage.  [¶] The parties to this agreement have the intent and desire to define the respective rights of each in the property of the other after their marriage.  [¶] … [¶]

"e.  Separate Property.  [¶] The parties intend and desire that all property owned by either of them at the time of their marriage and all property that may come to either of them from any source during their marriage shall be their respective separate property except as otherwise provided."

This expression of the parties' intentions was supplemented by section 4 of the agreement, which stated:

"It is the intention of the parties by this agreement that all of the property listed herein shall remain the separate property of each, and that if either party shall hereafter desire to transfer his or her separate property to the other party, he or she shall do so by special written instrument or by testamentary disposition, to wit: a Will, and it is primarily the intent at this time not to co-mingle the separate property of the parties, not because of lack of any love or trust for the other, but to protect each other in case of death."

The foregoing provisions were implemented by the following substantive provisions in section 2 of the agreement:

"a.  No personal or real property is contemplated to be transferred to either by the other after marriage.

"b.  Status of Property.  [¶]  All real and personal property that either of the parties own at the time of their marriage and all real [and] personal property that may come to either of them from any source whatsoever during their marriage shall be their respective separate property, except as otherwise provided in this agreement or any agreement hereafter made in writing."

The phrase "except as otherwise provided in this agreement" was not implemented by the parties as the agreement did not identify any real or personal property that would become community property or would be transferred from one to the other as separate

9.

property. The agreement did list separate property owned by Sylvia—specifically, (1) the house and lot located on Ebbetts Street in Manteca, California along with the furniture at that location; (2) a bank account and a safe deposit box at the Stockton Savings and Loan; (3) U.S. savings bonds; (4) a 1963 Thunderbird; and (5) a diamond dinner ring valued at $16,000.

B.      Trial Court's Determinations

The trial court decided issues relating to the antenuptial agreement in two stages. The first stage ended in May 2011, when the court issued a written ruling that concluded the antenuptial agreement was valid. The second stage ended with the court's July 2014 judgment and included its September 2012 tentative ruling and its May 2014 proposed statement of decision.

1.      *Ruling on Antenuptial Agreement*

In May 2011, the trial court filed a five-page ruling on the antenuptial agreement. The ruling noted that it was undisputed that (1) Sylvia's attorney drafted the agreement and represented Sylvia when the agreement was executed and (2) Larry was not represented by counsel.

The ruling rejected Sylvia's contention that the agreement was invalid because Larry did not disclose his assets and liabilities as required by Family Code section 1615 or obtain her written waiver of the disclosure obligation. The court determined that the disclosure need not be in writing and found Sylvia was aware of Larry's assets based on her testimony.

The ruling also addressed Sylvia's contention that the agreement was ambiguous regarding the creation of community property. The trial court rejected this contention, stating that "a reading of the Agreement shows that the parties did not intend to and did not create a community property interest in either the property owned by the parties at the time the Agreement was entered into or in property which was obtained during the

10.

marriage." The court found that "the parties did not intend and did not define how community property would be created." As a result, the court determined that "all property that existed at the time of the marriage and all property acquired during [the] marriage from 'whatever source' remained the separate [property] of the party that received it."

Based on its analysis of the parties' arguments and the agreement's text, the trial court found the agreement was valid and directed the parties to be prepared to discuss the following issues at the next status conference—(1) the effect of the validity of the agreement on the property in dispute and (2) whether the character of the disputed property was transmuted.

That status conference was held in June 2011 and the minute order shows the trial court directed the parties to brief issues relating to (1) the effect of the antenuptial agreement on the disputed property; (2) the character of the disputed property and whether it was transmuted; and (3) the effect of the agreement on death rights. Subsequently, the parties filed further briefing of additional issues involving the agreement.

### 2. *Tentative Decision and Proposed Statement of Decision*

In September 2012, the trial court issued a 44-page tentative ruling with 77 pages of attachments containing the court's ruling on evidentiary objections presented by the parties.

The tentative ruling addressed Sylvia's argument that property acquired during the marriage with commingled funds—that is, funds deposited into their joint bank accounts—was presumptively a community asset. Mick had responded to this argument by contending the antenuptial agreement precluded the creation of community property and citing section 5305 as support.

11.

The trial court considered these arguments, and its previous ruling on the antenuptial agreement, and concluded that the agreement nullified the statutory community property presumption regarding property acquired during the marriage. The court was not convinced by Sylvia's cases regarding the effect of commingling funds and the burden of proof because the cases she cited did not involve an antenuptial agreement. The court stated that Sylvia "has provided no pertinent legal authority for the proposition that where there is a valid antenuptial agreement regarding the characterization of property, that the mere commingling of separate property funds in a joint account can change the character of the funds to community property."

After the filing of Mick's petition and the evidentiary hearings, the trial court issued its May 2014 proposed statement of decision that addressed the ownership of assets listed in Sylvia's petition and the claims made in Mick's petition. The contents of the proposed statement of decision are not set forth here because they were adopted in the July 2014 judgment.

### 3. Judgment

The attachment to the July 2014 judgment set forth the trial court's conclusions regarding the antenuptial agreement. The court stated the "antenuptial agreement has the effect of nullifying the statutory presumption of community property as well as waiving Sylvia's intestate inheritance rights." Thus, the court stated it was not persuaded by Sylvia's persistent assertion of community property presumptions. The court concluded that, as a result of the valid antenuptial agreement, any income derived by Larry from his labor, time or skill during the marriage was his separate property and the commingling of Larry's and Sylvia's incomes in a joint bank account did not create community property funds. The court also concluded the act of commingling did not modify the agreement.

12.

C.    Community Property

    1.    *Sylvia's Theories of Error*

Sylvia contends that the trial court's conclusion that the antenuptial agreement precluded the creation of community property was error.  She argues that the trial court disregarded California's presumption that assets purchased during the marriage with commingled funds are presumed to be community property.

First, Sylvia argues the presumption applied because the antenuptial agreement does not reflect the "true intent" of the parties.  Sylvia's contention about the true intent regarding community property is based on (1) her testimony, (2) a declaration about community property in Larry's petition of dissolution of marriage; and (3) conduct occurring after the marriage, particularly the commingling of funds in joint bank accounts.

Second and alternatively, Sylvia argues that if the court properly interpreted the agreement at the time of signing, the agreement was modified by the conduct of Sylvia and Larry during their 19-year marriage.

    2.    *True Intent—Silva's Testimony about the Agreement*

Sylvia argues that "it was her belief that the Prenupt only preserved their separate property prior to marriage.  It was never intended to preclude the creation of a community estate after marriage.  [Citations.]"  As support for this argument, Sylvia cites her testimony that she had the agreement prepared "[t]o protect all of my property."  Sylvia's reliance on her own testimony has a number of flaws.

First, the cited testimony did not actually state how property acquired after the marriage would be classified.  Thus, the assertion in Sylvia's opening brief that "Sylvia testified that she had no intent to preclude the creation of a community estate (Reporter's Transcript Vol. 1 pg. 16 ln. 26, pg. 17 ln. 1-19)" mischaracterizes the content of her testimony.

13.

Second, Sylvia's personal belief about the intent underlying the antenuptial agreement is irrelevant unless that intent was communicated to Larry. It is a well-established principle of California contract law that "the uncommunicated subjective belief of a contracting party is not competent evidence to prove the meaning of the contract." (*Stewart Title Co. v. Herbert* (1970) 6 Cal.App.3d 957, 964; see Civ. Code, § 1565, subd. 3 [communication essential to consent].) In this case, Sylvia has cited no evidence showing her alleged beliefs about the intent or meaning of the agreement were communicated to Larry.

Third, even if *Sylvia had testified* that she and Larry had expressly communicated to one another at the time of signing the agreement that they did not intend to preclude the creation of a community estate after the marriage, this court could not rely on that testimony as reflecting the parties' true intentions. The trial court expressly found that Sylvia was not a credible witness. As a court of review, we are bound by this credibility finding because Sylvia has failed to address—much less demonstrate—the credibility finding was erroneous under the highly deferential standard of review. (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043 [trier of fact is free to disbelieve a witness, even one uncontradicted, if there is any rational ground for doing so]; see Evid. Code, § 780 [factors relating to truthfulness of testimony].)

Given the weakness of Sylvia's attempts to use her own testimony to establish intent, we need not undertake the additional step of determining whether her testimony was admissible extrinsic evidence under California's parol evidence rule. (Code Civ. Proc., § 1856; see Civ. Code, §§ 1625, 1638, 1639.)

*3.        True Intent— Declaration in Larry's Petition for Dissolution*

The petition for dissolution of marriage that Larry filed on September 9, 2009, included (as item 5) a "DECLARATION REGARDING COMMUNITY AND QUASI-COMMUNITY ASSETS AND DEBTS AS CURRENTLY KNOWN." Under this item,

14.

Larry listed four vehicles, "[t]ools purchased during the marriage," "Retirements," and household goods, furnishings and appliances. Larry signed the petition under penalty of perjury.

Sylvia argues that Larry's declaration confirmed the existence of acquired community property, was prepared with the assistance of counsel, and was verified when there was no dispute over the antenuptial agreement. Sylvia contends the declaration is the best evidence of Larry's state of mind shortly before he died, but that the trial court ignored this evidence.

The attorney who represented Larry in the dissolution proceeding, Marvin Brown, testified about his preparation of the petition for dissolution that Larry signed. Brown stated that Larry said he believed there was an antenuptial agreement, but Larry was unable to locate it or remember the name of the attorney who prepared the agreement. As a result, Brown filled out the petition for dissolution without knowing the terms of the antenuptial agreement signed in 1990. Brown testified that if he had received the agreement prior to preparing the petition for dissolution, he would have prepared the petition differently and listed property that Larry acquired during the marriage through his efforts or as gifts as separate property.

Based on the testimony of Brown, the trial court did not err in giving little weight to the declaration about community and quasi-community property in Larry's petition for dissolution when it determined the meaning and effect of the antenuptial agreement. Larry and his attorney did not have a copy of the agreement when the petition was prepared and Larry was unable to remember the terms of the agreement. Therefore, the declaration in the petition for dissolution sheds little, if any, light on "the mutual intention of the parties *as it existed at the time of contracting*." (Civ. Code, § 1636, italics added.)

### 4. *True Intent—Subsequent Conduct of the Parties*

Under California contract law, the objective manifestations of the parties' mutual intent at the time of contracting includes "the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and *the subsequent acts and conduct of the parties*. (Civ. Code, §§ 1635-1656; Code Civ. Proc., §§ 1859-1861 ….)" (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 474, italics added.)

Sylvia refers to the rule of law about post-execution conduct and "asserts she and Larry's conduct over 19 years demonstrates their understanding and intentions under the Prenupt, regardless of its actual language." The subsequent conduct relied upon by Sylvia is (1) their opening of joint savings and checking accounts shortly after their marriage; (2) their depositing and commingling of their incomes in the accounts throughout the marriage; and (3) their keeping their premarital separate property separate after the marriage. Sylvia contends "[t]hese facts are inconsistent with the court's conclusion of the legal effect of the Prenupt."

Sylvia's contention about their subsequent conduct fails to recognize the conduct was ambiguous. The conduct of opening joint bank accounts and commingling funds in those accounts reasonably supports conflicting inferences. It is possible to infer Larry and Sylvia intended those funds to be community property. It also is reasonable to infer that they intended the funds deposited into the joint accounts (1) to retain their status as separate property *in accordance with the wording of the antenuptial agreement* and (2) to be subject to the rules for tracing separate property. There is no rule of law in California that funds commingled in a bank account by a married couple *always* become community property. (See § 5305.)

16.

Subdivision (a) of section 5305 states that if parties to an account are married to each other, their net contribution to the account is presumed to be community property. Subdivision (b) states that this presumption may be rebutted by proof that (1) the sums on deposit that are claimed to be separate property can be traced from separate property or (2) the married persons made a written agreement that expressly provided the sums on deposit were not to be community property. The language in the antenuptial agreement about property remaining the separate property of each spouse was broad enough to cover sums on deposit and overcome any presumption that those sums were community property. Sylvia's appellate briefing does not mention section 5305 and, as a result, does not affirmatively show that the trial court erred in its application of its provisions to the facts of this case.

In summary, Sylvia's claim that the true intent of the antenuptial agreement is demonstrated by her testimony, Larry's declaration, and their subsequent conduct does not convince us that the trial court erred in its interpretation or application of the agreement.

### 5. *Modification by Subsequent Conduct*

As an alternative to her argument about true intent, Sylvia contends that the conduct after marriage resulted in a modification of the antenuptial agreement. This contention is based on the idea that the conduct by Sylvia and Larry after the marriage did not conform to the agreement and the following principle from *Garrison v. Edward Brown & Sons* (1944) 25 Cal.2d 473 (*Garrison*): "Before a contract modifying a written contract can be implied, the conduct of the parties according to the findings of the trial court must be inconsistent with the written contract so as to warrant the conclusion that the parties intended to modify the written contract. [Citation]." (*Id*. at p. 479.) *Garrison* did not involve an agreement entered into before marriage. As a result, the court did not

17.

consider the application of California's version of the Uniform Premarital Agreement Act, which is codified in Family Code sections 1600 through 1617.

Sylvia's modification argument is based on general contract principles and provisions from the California Commercial Code about course of performance. She has not addressed Family Code section 1614, which governs the modification of premarital agreements: "After marriage, a premarital agreement may be amended or revoked *only* by a written agreement signed by the parties." (Italics added.) This statute compels the conclusion that the antenuptial agreement signed by Sylvia and Larry in August 1990 could be modified only by another written agreement, not by their subsequent conduct. Therefore, the trial court correctly rejected Sylvia's argument that the agreement was modified by conduct.

## II. PRESUMPTION OF TITLE

Another ground for Sylvia's claim that certain vehicles were community property is based on how registration and title documents of the Department of Motor Vehicles (DMV) were worded and the statutory presumptions that apply to those documents.

### A. Legal Principles

The Vehicle Code addresses the ownership of a vehicle by two or more persons and how documents using the conjunction "or" affect that ownership.

> "(a) A vehicle may be registered in the names of two (or more) persons as coowners in the alternative by the use of the word 'or.' A vehicle so registered in the alternative shall be deemed to be held in joint tenancy. Each coowner shall be deemed to have granted to the other coowners the absolute right to dispose of the title and interest in the vehicle. Upon the death of a coowner the interest of the decedent shall pass to the survivor as though title or interest in the vehicle was held in joint tenancy unless a contrary intention is set forth in writing upon the application for registration." (Veh. Code, § 4150.5; see Veh. Code, § 5600.5 [transferees as coowners].)

18.

These relatively specific Vehicle Code sections are affected by Family Code section 852, subdivision (a) – a broadly worded provision that addresses the transmutation of property by spouses:

> "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected."

In *Estate of Bibb* (2001) 87 Cal.App.4th 461 (*Bibb*), the court addressed how the Vehicle Code provisions addressing the ownership of vehicles interacted with the Family Code provision governing the transmutation of property. Specifically, the court considered a Rolls Royce that had been registered in the husband's name alone and subsequently reregistered in the names of the husband "or" the wife. (*Id*. at p. 469.) Despite the Vehicle Code's use of the phrase "shall be deemed," which appears mandatory, the court concluded that the Vehicle Code did not resolve the ownership issue presented. The court stated that the "general form of title presumption created by Vehicle Code sections 4150.5 and 5600.5 should not be used to negate the requirements of [Family Code] section 852, subdivision (a) …. [Citations.]" (*Bibb*, *supra*, at p. 470.) Reading the two statutes in this manner assures that a spouse's separate property entitlements are not undermined. (*Ibid*.)[5] The court concluded that the DMV documents did not contain a clear and unambiguous expression of the husband's intent to transfer his interest in the Rolls Royce and, therefore, the car was not validly transmuted from his separate property. (*Ibid*.)

---

[5] We note that Family Code section 2581 provides that, for purposes of dividing property *in a dissolution of marriage*, property acquired during the marriage and held in joint tenancy or tenancy in common is presumed to be community property. This presumption may be rebutted by "a written agreement that the property is separate property" (Fam. Code, § 2581, subd. (b)), such as the antenuptial agreement signed by Larry and Sylvia. This section is not directly applicable because this case is not a dissolution proceeding.

B.      Trial Court's Findings

In the present case, certain DMV records showed that vehicles had been registered in the names of Larry *or* Sylvia. The trial court cited *Bibb* and concluded that there was no evidence the registrations complied with the requirements of Family Code section 852 and, as a result, constituted a valid transmutation of property. In addition, the court found the terms of the antenuptial agreement provided sufficient evidence to overcome the statutory presumption of title.

C.      Title as Indicative of the Creation of a Community Estate

1.      *Sylvia's Contention*

Sylvia contends that at the time of acquisition of the vehicles in question, the DMV title was for husband "or" wife and this constituted evidence of community property with the right of survivorship. Sylvia argues this presumption of title should have been applied and the trial court erred in concluding four of the disputed vehicles were Larry's separate property and 50 percent of the 1950 Mercury was Larry's separate property.

2.      *Analysis*

We agree with the statement by the court in *Bibb*—a case not cited in Sylvia's appellate briefing—that the presumption of title created by Vehicle Code section 4150.5 does not negate the requirements for transmutation of property set forth in Family Code section 852, subdivision (a). Consequently, the use of "or" in the DMV records at the time the vehicles were acquired does not establish those vehicles were Larry and Sylvia's community property with a right of survivorship. Stated from another point of view, the trial court reasonably concluded that the antenuptial agreement expressed Larry and Sylvia's intention to hold the vehicles as separate property, which rebutted any intention to transmute the vehicles to community property.

Therefore, the trial court did not err when it concluded the presumption of title created by the Vehicle Code was not controlling in this case.

20.

III.    WAIVER OF INHERITANCE RIGHTS

        A.    Context

Sylvia's claim that the trial court erred in determining she waived her inheritance or death rights is connected to her arguments about the existence of community property. If Sylvia had established the existence of community property, then her next step would have been to show that the antenuptial agreement did not waive her rights as a surviving spouse to inherit that community property. (See generally, §§ 140-147 [surviving spouse's waiver of death rights].)

The legal basis for Sylvia's claim to all community property is provided by sections 100 and 6401. Subdivision (a) of section 100 provides that "[u]pon the death of a married person, one-half of the community property belongs to the surviving spouse and the other half belongs to the decedent."[6] The decedent's half of the community property is subject to testamentary disposition (§ 6101) and, in the absence of a testamentary disposition, passes by intestate succession to the surviving spouse under section 6401, subdivision (a). Here, Larry died without a will and, as a result, Sylvia relies on section 6401 to claim his half of the community property as his surviving spouse.

Our conclusion that the trial court correctly determined that Sylvia and Larry had no community property means it is not necessary for us to address Sylvia's argument that she did not waive her rights to inherit community property. Nevertheless, we address the waiver issue to provide a full record in the event a petition for review is sought.

        B.    Trial Court's Determinations

The trial court's determinations regarding Sylvia's right to inherit from Larry are set forth in the attachment to the July 2014 judgment:

_____

**6**    Pursuant to section 13650, subdivision (a), a surviving spouse may file a spousal property petition requesting "an order confirming the ownership of the surviving spouse of property belonging to the surviving spouse under Section 100 …."

"[T]he court finds that the antenuptial agreement constitutes an effective waiver of inheritance rights under Probate Code section 141, subdivisions (a)(1) and (a)(10). The antenuptial agreement does not contain language expressly waiving Sylvia's intestate inheritance rights, but does so implicitly by stating that if either of the parties desires to transfer his or her separate property to the other, he or she will do so only by special written instrument or testamentary distribution. Given that the antenuptial agreement nullifies the statutory presumption that the acquisition of property during the marriage creates community property interests in that property, Sylvia therefore has no interest—separate or community—in decedent's property acquired either before or during the marriage that would pass to her by intestacy."

C.      Contentions

Sylvia contends the trial court erred by finding that the antenuptial agreement resulted in an implicit waiver of her intestate inheritance rights. Sylvia asserts her petition only dealt with confirming that the assets she listed passed to her upon Larry's death and made no request for a ruling on the language of the agreement relating to a waiver of inheritance. In addition to this procedural point, "Sylvia asserts the actual language in the Prenupt is counterintuitive to the court's finding on an issue never raised."

D.      Analysis of the Claims of Errors

1.      *Procedural Issue*

Sylvia's argument that the trial court did "not have the license to rule on an implicit waiver of intestate rights, especially where no such ruling was requested" is not convincing because she has provided no legal authority for the principle that the court's "license" or jurisdiction is limited to the issue raised in her petition and excludes issues raised by the opposition to her amended spousal property petition. (See generally, §§ 13650-13660 [provisions governing spousal property petitions].)

First, section 13656 describes the orders that a court may issue in determining what property, if any, passed to the surviving spouse. Subdivision (b) of section 13656 states in part:

"If the court finds that all or part of the estate of the deceased spouse is not property passing to the surviving spouse, the court shall issue an order (1) describing any property which is not property passing to the surviving spouse, determining that that property does not pass to the surviving spouse and determining that that property is subject to administration under this code and (2) describing the property, if any, which is property passing to the surviving spouse, determining that that property passes to the surviving spouse, and determining that no administration of that property is necessary."

The lead-in clause of this provision—"[i]f the court finds that all or part of the estate of the deceased spouse is not property passing to the surviving spouse"—implies that the trial court has the authority to decide the issues relevant to determining what property passes to the surviving spouse. Furthermore, sections 143 and 144 address the enforceability of a surviving spouse's waiver of rights—a determination that is made by the court. Based on these statutory provisions, we conclude that the trial court acted within its authority when it addressed and decided the waiver issue connected to Sylvia's claims to community property.

Second, Sylvia's argument can be interpreted as raising a violation of her procedural due process rights. Our independent review of the record shows that the supplemental declaration of Sally K. Chenault, dated January 5, 2011, devoted a page and a half to the antenuptial agreement and how it resulted in a waiver of Sylvia's intestate rights. Chenault was acting as counsel for Mick in his capacity as administrator of Larry's estate and her declaration was submitted in support of Mick's opposition to Sylvia's amended spousal property petition. Chenault's declaration explicitly asked the trial court to "interpret the Antenuptial Agreement to … waive death rights." Therefore, the papers presented by Mick clearly raised the issue of Sylvia's waiver of inheritance rights more than four months before the trial court issued its May 2011 ruling on the antenuptial agreement. Consequently, Sylvia had adequate notice and an opportunity to be heard on the waiver issue and, as a result, the trial court did not violate her procedural due process rights when it decided the issue.

23.

Therefore, we reject Sylvia's argument that the trial court did not have license to rule on whether she waived her inheritance or death rights by signing the antenuptial agreement.

## 2. Interpreting the Antenuptial Agreement as a Waiver

Sylvia's second challenge to the trial court's determination that the antenuptial agreement effectively waived her inheritance rights asserts the trial court misinterpreted the antenuptial agreement. She refers to the section in the agreement labeled "Intent to Provide for Future Wife," which stated "LARRY KINERSON intends and desires to provide fairly and reasonably for SYLVIA LAFFRANCHINI." Sylvia argues: "This [provision] would evidence an intent to provide '*fairly and reasonably*' for the surviving spouse post death. Is the preclusion of intestate rights fair and reasonable in a 19 year marriage?"

For purposes of this discussion, we accept Sylvia's position that the antenuptial agreement is ambiguous as to the question of waiver of inheritance rights and conclude that she has presented one of the reasonable interpretations that resolves that ambiguity. (See *Adams v. MHC Colony Park, L.P.* (2014) 224 Cal.App.4th 601, 619 [the threshold question of whether contractual language is ambiguous presents a question of law subject to independent review].) Furthermore, we assume that the evidence relevant to the interpretation of the agreement is not controverted and, as a result, the interpretation of the agreement is solely a judicial function and subject to de novo review on appeal. (See *Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 436; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) This assumption is favorable to Sylvia because, if the evidence was controverted, the deferential substantial evidence standard of review would apply to the trial court's interpretation. Based on this assumption, we address the ambiguity relating to the waiver issue by conducting an independent review of the agreement's wording and the relevant extrinsic evidence. (See *Scheenstra v.*

24.

*California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 390 [interpretation of document subject to independent review].)

The provisions in section 2 of the antenuptial agreement, that are quoted in part I.A, *ante*, precluded the property that came to Sylvia or Larry before or during their marriage from becoming community property. Section 4 of the agreement stated "that if either party shall hereafter desire to transfer his or her separate property to the other party, he or she shall do so by special written instrument or by testamentary disposition …." This provision used the mandatory term "shall" and made no mention of transfers occurring by intestate succession or other means. The use of the word "shall" supports the inferences that the methods of transfer authorized by the agreement were the only methods the parties intended to be available. In other words, those methods were exclusive. Based on the use of the word "shall" and the exclusion of transfers by intestate succession, we infer that the parties did not intend for separate property to be transferred by intestate succession, which is substantively the same as each spouse relinquishing or waiving any right to inherit by intestate succession. Therefore, we conclude the most likely interpretation of the agreement is that it waived inheritance rights.

The extrinsic evidence also supports this interpretation. The extrinsic evidence about the meaning of the antenuptial agreement includes the discovery responses in which Sylvia admitted that at the time she signed the antenuptial agreement she intended that Larry would inherit nothing from her. Because the language in section 4 of the antenuptial agreement refers to "either party" and "he or she," it follows that Sylvia also understood section 4 to mean that she would not inherit from Larry if he died without a will.

Sylvia attempts to distinguish her right to inherit from Larry's right to inherit by referring to section 1.d. of the agreement, which stated Larry intended and desired to provide fairly and reasonably for Sylvia. This language is general in nature and we

25.

conclude it does not alter the meaning of the waiver of inheritance rights that is implied from the language in section 4 of the agreement. In other words, the inference about the intent to preclude Sylvia's waiver of those rights is weaker than the inference drawn from the more specific mention of testamentary dispositions and the exclusion of intestate distributions in section 4 of the antenuptial agreement. (See Civ. Code, § 3534 [particular expressions qualify general language].)

Therefore, we reject Sylvia's argument that the language in the antenuptial agreement is counterintuitive to concluding inheritance rights were waived. We conclude the trial court correctly interpreted the agreement regarding its effect as a waiver of the surviving spouse's inheritance rights.

IV. SYLVIA'S CONTRIBUTING EFFORTS TO VEHICLE RESTORATION PROJECTS

A. Trial Court's Findings

The attachment to the judgment includes the trial court's findings about the efforts that Larry and Sylvia contributed to the numerous vehicle restorations completed during their 19-year marriage. The court found that the vehicles were (1) brought to Larry to be customized for a price or (2) purchased by him, restored, and sold for a considerable profit. The court found that Larry "was exceedingly talented and skilled at the restoration of vehicles" and "Sylvia's participation was limited to secondary or supportive role such as being sent to the store to purchase parts, tools or paint."

The trial court also found that "the unreported custom work performed over the years by [Larry] produced significant income each year, particularly the last 15 years of the marriage." In addition, "the income stream produced by [Larry's] personal skill and efforts accounted for the income used to purchase the various vehicles."

B. Sylvia's Theory of Error

Sylvia contends the trial court erred by crediting Larry's efforts and disregarding her own. Specifically, Sylvia contends that (1) her efforts in restoring vehicles was not

limited to a secondary or supportive role and (2) there was no evidence of a vast income from the projects that could be classified as Larry's separate property. In Sylvia's view, "the restoration of classic cars was a joint effort by Larry and Sylvia. An effort that was very costly in terms of time and money, but not very profitable."

### C. Trial Court's Findings Are Supported by Substantial Evidence

#### 1. *Standard of Review*

A trial court's findings of fact are reviewed under the substantial evidence standard. (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.) Under this standard, appellate courts consider all evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in support of the findings. (*Ibid.*) Appellate court's may not reweigh the evidence and, nearly always, are bound by the trial court's credibility findings. (*Ibid.*)

#### 2. *Finding Relating to Sylvia's Efforts*

The finding that Sylvia's efforts were secondary is supported by the testimony of Steve Scialabba, Dennis King, Ron Fair, and others. Scialabba testified that he was a friend of Larry and Sylvia and he "never saw Sylvia do any bodywork or any painting or anything." King, a street rod fabricator, knew Larry as a body man and painter. King testified that he had never known of Sylvia working on any cars. Fair, the manager of a branch of Clark's Pest Control, knew Larry for approximately 50 years and hired Larry to repair some of the business's trucks and his company car. Sometimes Fair would deliver the trucks to Larry and would spend time in Larry's shop. Fair testified that he never saw Sylvia work on any kind of vehicle. The trial court explicitly found the testimony of Scialabba, King and Fair to be credible. In contrast, the court explicitly found "that Sylvia and her son, Stanley Laffranchini[,] are not credible witnesses."

First, Sylvia has not argued, much less demonstrated, that the trial court erred in making its credibility findings regarding her testimony and the testimony of Scialabba,

King, Fair and others. Second, the testimony found credible by the court constitutes substantial evidence supporting the finding that Sylvia's efforts relating to the restoration projects were secondary or supportive. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [testimony of a single witness constitutes substantial evidence].) Consequently, the finding relating to Sylvia's efforts do not constitute factual error.

As an additional challenge to the trial court's finding, Sylvia's opening brief cites Government Code section 12940 as prohibiting discrimination based upon gender, contends this code section "implies a woman's efforts are equal to that of a man," and asserts that the court completely downplayed Sylvia's efforts and skill when rendering its decision. We conclude the appellate record does not establish the trial court improperly evaluated Sylvia's efforts because of her gender. The trial court was faced with conflicting evidence about Sylvia's efforts and, as is appropriate for a trier of fact, made credibility findings regarding the conflicting testimony in resolving the factual issue presented. The court downplayed or discounted Sylvia's testimony about her contributions to the restoration of classic cars based on that testimony's lack of credibility. We have located nothing in the record suggesting that the trial court was biased against Sylvia because of her gender.

### 3. Finding Relating to Income Generated by Restoration Projects

Sylvia argues that "there is no evidence in this record that Larry actually earned the sums claimed to fund the purchase of project cars and their restoration." We conclude that the record does contain evidence of money earned on restoration projects, such as (1) the 1932 Ford that was sold in 2000 for $40,000; (2) the 1946 Ford sold for $22,000 or $25,000; and (3) the 1951 Ford convertible sold in 2004 for $35,000. The record also illustrates Larry's ability to earn cash working on vehicles owned by others, such as the $1,000 he was paid by Larry Ferreira for work on Ferreira's 1935 DeSoto.

Therefore, we reject Sylvia's claim that there is no evidence to support the trial court's finding that Larry generated a substantial separate income by working on restoration projects.

We also note that the trial court's evaluation of the evidence about the income generated by the restoration projects was influenced by two other factors. First, it appears that the income was not reported for purposes of state and federal income tax. Second, Sylvia had a large degree of control over the family finances. These factors explain the absence of a complete paper trail for each profitable restoration. The deferential substantial evidence standard of review does not require a complete paper trail to support the trial court's finding that Larry generated substantial income from his restoration work. Therefore, its absence does not compel this court to reverse that finding for lack of evidentiary support.

V. SYLVIA'S DIRECT TRACING

A. Background

The trial court found that (1) the 1956 Chevy panel van was the estate's separate property and (2) Sylvia and the estate were co-owners of an undivided equal share of the 1950 Mercury and 1983 Tommy trailer.

B. Contentions

Sylvia's opening brief contends the trial court erred by ignoring the evidence she presented to directly trace the funds used to purchase the 1950 Mercury, the 1983 Tommy trailer, and the 1956 Chevy panel van to her separate property. Sylvia argues: "That evidence consisted of bank records, as well as her and Stanley's testimony. Mick offered no evidence as to the origins of the funds to purchase these vehicles."

Mick contends no error occurred because the trial court disbelieved Sylvia's tracing model and explicitly found the testimony of Sylvia and her son, Stanley Laffranchini, was not credible.

Sylvia's reply brief contends Mick failed to address her direct tracing of her purchase of the 1956 Chevy panel van and the trades that began with her 1963 Thunderbird and resulted in the acquisition of the 1950 Mercury and 1983 Tommy trailer.

C.        Analysis

First, we conclude Mick's respondent's brief did address Sylvia's direct tracing argument by pointing out the trial court rejected Sylvia's tracing by finding her evidence was not credible.  Therefore, his brief cannot be interpreted as (1) conceding the argument to Sylvia or (2) waiving or forfeiting the point.

Second, the trial court identified its basis for providing the estate with a part ownership interest in the 1950 Mercury and 1983 Tommy trailer.  The court stated it was undisputed that the Mercury was restored by Larry.  The court found Larry's restoration efforts were his separate property pursuant to the terms of the antenuptial agreement.  Thus, the court's finding that Larry's owned 50 percent of those assets is based on its tracing of his restoration work.

Third, with respect to the 1956 Chevy panel van, the trial court found it was purchased from Stanley Laffranchini with income produced by Larry's personal skill and efforts in restoring vehicles and the inability to specifically trace the purchase funds was caused by Sylvia's control of their finances, which included "shifting assets to various accounts for the benefit of others outside the marriage."

Therefore, Sylvia has not shown that the trial court erred by ignoring her evidence and arguments relating to direct tracing.  The court evaluated her evidence and arguments by finding her evidence lacked credibility and by drawing inferences from the evidence addressing the factual question of tracing that withstand scrutiny under the substantial evidence standard of review.

VI.   INCONSISTENT APPLICATION OF PRESUMPTION OF TITLE

   A.   Inconsistent Positions Regarding the Presumption of Title

      1.   *Sylvia's Contentions*

Sylvia contends the trial court erred by adopting inconsistent positions when it addressed the presumption of title for the vehicles in question. Sylvia states that the trial court made a general determination that the DMV documents were not indicative of anything and concluded four of the disputed vehicles were Larry's separate property, which is inconsistent with the following specific statements by the court about the 1950 Mercury and 1983 Tommy trailer:

> "The DMV titles to the 1950 Mercury and 1983 Tommy trailer were held in the names of Larry *or* Sylvia until Sylvia changed title to her name only on August 17, 2009. During the pendency of the dissolution and prior to Larry's death, the DMV titles were changed to Larry *and* Sylvia evidencing common ownership. The court finds the estate and Sylvia are co-owners of an undivided equal share of the 1950 Mercury and 1983 Tommy trailer."

Sylvia focuses on the language about the change of title "to Larry *and* Sylvia evidencing common ownership"[7] and argues:

> "The court stated that presumption of title was not indicative of the status of property, only how the asset was acquired. If that is the court's position, then how did the estate gain a 50 percent interest in the assets Sylvia acquired with her separate property based solely on how title was held? [¶] This ruling is selectively for the benefit of the estate, it prejudices Sylvia, and impugns the impartiality of the court. This ruling was error and must be reversed."

Sylvia's reply brief elaborates on her interpretation of the court's decision by stating that "the court found that the change in title for the 1950 Mercury and 1983

---

[7]   Use of the conjunction "and" between the names of a vehicle's co-owners is address by Vehicle Code section 4150.5, subdivision (c), which states that the signature of each co-owner is required to transfer title to the vehicle. Thus, the change in title to Larry *and* Sylvia could have been interpreted as a measure to prevent a sale or transfer by one without the consent of the other.

Tommy trailer, both traceable to [Sylvia's] separate property, was a transmutation from [Sylvia's] separate property to co-ownership." Sylvia contends that if all titles to all vehicles were held in the same manner, there was no basis for the court treating the 1950 Mercury and 1983 Tommy trailer differently from the other vehicles.

## 2. Mick's Contentions

Mick presents a different interpretation of the portion of the trial court's decision addressing the 1950 Mercury and 1983 Tommy trailer. He asserts that the trial court "concluded that these items were acquired by the joint efforts of [Sylvia] and [Larry] and granted each a 50% interest therein." Mick also asserts that the court's finding that Sylvia was entitled to 50 percent of the 1950 Mercury and 1983 Tommy trailer "demonstrates that the Court considered [Sylvia'] purported contribution" to the restoration work.

Thus, Mick disputes three aspects of Sylvia's argument. First, he disagrees with Sylvia's factual assertion that the 1950 Mercury and 1983 Tommy trailer were traceable to her separate property. He also disagrees with Sylvia's interpretation that (1) the trial court found a transmutation of property occurred and (2) the purported transmutation was based *solely* on the way title was held.

## 3. Ambiguity in the Decision

Our first step is to resolve the disagreement upon how to interpret the trial court's decision. Although the trial court's finding that Sylvia and the estate owned equal shares of the 1950 Mercury and 1983 Tommy trailer resolved the question of ultimate fact presented, the decision lacks detailed findings of historical or evidentiary facts that completely explain the finding of ultimate fact. As a result, we conclude the trial court's decision is ambiguous as to the basis for its determination of equal ownership of the 1950 Mercury and 1983 Tommy trailer.

32.

Objection Nos. 3 and 4 of Sylvia's objections to trial court's proposed statement of decision asserted the trial court's findings regarding ownership of the 1950 Mercury and 1983 Tommy trailer contained ambiguities. However, on appeal, Sylvia has not asserted the ambiguities as a ground for reversing and remanding for additional findings to clarify that ambiguity.[8] Consequently, our examination of the trial court's decision for reversible error is concerned primarily with (1) whether the finding of ultimate fact is supported by substantial evidence and (2) whether the decision shows the trial court committed legal error in analyzing the ownership of the 1950 Mercury and 1983 Tommy trailer. Our inquiry into factual and legal error is shaped by how Sylvia has presented her arguments asserting inconsistent application of the presumption of title.

### 4.    Tracing Separate Property

Sylvia contends the facts show that the 1950 Mercury and 1983 Tommy trailer were traceable to her separate property. As discussed in part V of this opinion, Sylvia's contention is partially true—some, but not all, of the value represented by these assets is traceable to her separate property.

Her tracing begins with the 1963 Thunderbird, which the antenuptial agreement identified as her separate property. That vehicle was traded in 1991 for a black Corvette, which in turn was traded to Albert Neilson in 1995 for the 1950 Mercury, the 1983 Tommy trailer and cash. In her May 2012 reply to Mick's brief addressing the tracing of assets, Sylvia states that the "Corvette was one of [Larry's] first projects." This statement

---

[8]    We do not mean to imply any criticism of Sylvia's decision to abandon that issue because an objectively reasonable litigant, weighing the likelihood of obtaining an order from this court requiring additional findings of evidentiary or historical fact *and* the likelihood of obtaining favorable findings from the trial court if a remand and further proceedings were ordered, could have determined the chance of winning both issues was minimal and not worth pursuing on appeal. (See Herrmann & Jenks, *Great Briefs and Winning Briefs* (Summer 1993) 19 Litigation 56 [positing that winning is more likely when counsel focuses on only the strongest arguments and omits weaker arguments, and recognizing the difficulty practitioners face in choosing].)

implies that Larry worked on the Corvette and added to its value.  The value Larry added was his separate property and, therefore, he obtained a separate property interest in the Corvette.  Similarly, when the Corvette was traded for the 1950 Mercury and 1983 Tommy trailer, Larry worked on the Mercury and added to its value, thus generating a further separate property interest.  The trial court's finding that Sylvia and the estate were equal co-owners of the 1950 Mercury and 1983 Tommy trailer is consistent with attributing some value to Sylvia's 1963 Thunderbird and some value to Larry's restoration work.

Accordingly, we do not interpret the trial court's decision as finding equal ownership based on an implied finding that Sylvia's separate property was transmuted into Larry separate property.  Therefore, we reject Sylvia's argument that the trial court's decision regarding ownership was based on a transmutation occurring because the DMV titles were changed to use the word "and."  Instead, we interpret the court's reference to the change of title to Larry *and* Sylvia as "evidencing common ownership" to mean the form of title provides some additional evidence consistent with the trial court's tracing of the contributions Sylvia and Larry made to the 1950 Mercury and 1983 Tommy trailer.

In summary, the trial court's finding that Sylvia and the estate co-owned equal shares of the 1950 Mercury and 1983 Tommy trailer is not the result of inconsistent application of the presumption of title or a finding of transmutation.  Rather, the finding of ownership is based on the evidence relating to the separate contributions of Sylvia and Larry, which in the case of the Mercury and trailer happened to be consistent with the change in title to Sylvia *and* Larry.

34.

## VII. PROCEDURAL ISSUES

### A. Petition to Determine Property Rights

#### 1. *Contentions*

Sylvia contends the trial court erred by treating the spousal property petition she filed under section 13650 as one brought under section 850. She argues that when a spousal property petition is filed, the estate and the surviving spouse have co-equal rights and equal burdens and, in contrast, the presumption under section 850 is that the disputed property belongs to the estate and the burden of proof is on the claimant. Thus, in Sylvia's view, the trial court's decision to treat her petition as one brought under section 850 resulted in the court applying the wrong burden of proof and depriving her of the presumption that property acquired after the marriage was community property.

In addition, Sylvia contends the trial court erred by treating her petition as one brought under section 850 because spousal property petitions under section 13650 are summary in nature and the court eliminated those summary aspects and skewed the proceedings against her. She argues that if her petition was improper, the court's remedy was to dismiss, instead of subjecting to her a proceeding where the burden was on her to trace her ownership—a task she describes as impossible for assets acquired with commingled funds.

In response, Mick contends that section 13650 was inapplicable because (1) there was no community property that Sylvia could claim and (2) petitions under section 13650 do not encompass a request by a surviving spouse for court confirmation of that spouse's *separate* property interests. Mick also contends that the trial court had the discretion to treat Sylvia's petition as brought under section 850 because that is an appropriate mechanism for determining Sylvia's alternate claim that she held a separate property interest in the disputed assets.

### 2. *Statutory Provisions*

Section 13650 provides: "(a) A surviving spouse … may file a petition in [probate court] … requesting an order that administration of all or part of the estate is not necessary for the reason that all or part of the estate is property passing to the surviving spouse. The petition may also request an order confirming the ownership of the surviving spouse of property belonging to the surviving spouse under Section 100 or 101." Section 100, subdivision (a) provides that one-half of the community property belongs to the surviving spouse upon the death of the other spouse. (See pt. III.A, *ante*.) Section 101 sets forth the same rule for quasi-community property.

Section 850 authorizes another type of petition to determine the ownership of property in a probate proceeding.[9] Pursuant to subdivision (a)(2) of section 850, the decedent's personal representative or any interested person may file a petition requesting an order in the following cases:

> "(C) Where the decedent died in possession of, or holding title to, real or personal property, and the property or some interest therein is claimed to belong to another.

> "(D) Where the decedent died having a claim to real or personal property, title to or possession of which is held by another."[10]

Neither section 13650 nor section 850 expressly authorize or prohibit a trial court from treating a petition originally filed under section 13650 as being brought under section 850. In the absence of a specific statute, we turn to the statute that grants probate courts their general authority. Section 800 states that a court proceeding under the Probate Code is a court of general jurisdiction with "the same power and authority with

---

[9] Section 850 is included in Part 19 of Division 2 of the Probate Code (§§ 850-859), which addresses the conveyance and transfer of property claimed to belong to a decedent or another person. (See Stats. 2001, ch. 49, § 1 [Sen. Bill No. 669].)

[10] Former section 9860, subdivisions (a)(3) and (a)(4) are the verbatim predecessors of these two provisions. (See *Estate of Brenzikofer* (1996) 49 Cal.App.4th 1461, 1464, fn. 1; Stats. 2001 ch. 49, § 4 [repealing the chapter commencing with § 9860].)

36.

respect to the proceedings as otherwise provided by the law for a superior court, including, but not limited to, the matters authorized by Section 128 of the Code of Civil Procedure." Code of Civil Procedure section 128, subdivision (a) provides that every superior court shall have the power to "provide for the orderly conduct of proceedings before it" (*id.,* subd. (a)(3)) and to "control its process … so as to make that conform to law and justice" (*id.,* subd. (a)(8)).

### 3. *No Mandatory Right to Dismissal of Petition*

The foregoing statutes do not require the dismissal of a spousal property petition once the trial court has determined there is no community property in the probate estate. Furthermore, Sylvia has cited no statute, rule of court, or case law to support her argument that dismissal was the appropriate remedy. Consequently, we conclude the trial court did not violate an explicit mandatory right or entitlement held by Sylvia when it recharacterized her petition rather than dismissing it.

### 4. *Scope of Discretionary Authority*

The absence of authority expressly prohibiting or authorizing the conversion of a spousal property petition to a petition brought under section 850 leads to the question of whether such a conversion is within the trial court's discretionary authority. A source of discretionary authority is the trial court's general power to "provide for the orderly conduct of the proceedings before it." (Code Civ. Proc., § 128, subd. (a)(3); see Prob. Code, § 800.) We conclude the general grant of discretionary authority resulting from section 800's reference to Code of Civil Procedure section 128 is broad enough to empower the trial court to treat a spousal property petition brought under section 13650 as a section 850 petition if, as here, that petition specifically requests confirmation of the surviving spouse's ownership of property purchased with "community property funds and/or separate property funds" of the surviving spouse.

37.

Section 13650 petitions are designed to address community property. If the surviving spouse chooses to expand the petition to address separate property, then the court may consider and resolve the issues involving the claims to separate property. When such a petition is filed and the trial court determines that there is no community property, the orderly conduct of the proceedings is furthered by the trial court retaining rather than dismissing the dispute over what constitutes separate property of the surviving spouse. (Code Civ. Proc., § 128, subd. (a)(3).) In contrast, a dismissal of the petition might result in a waste of the resources the court and the parties had invested in the resolution of the dispute. Therefore, we interpret the statutes to mean that trial courts have the discretionary authority to recharacterize spousal property petitions as petitions brought under section 850 where the petition claims assets as separate property.

### 5. *No Miscarriage of Justice Occurred*

Having determined that the trial court had the discretion to treat Sylvia's petition as one brought under section 850, our last inquiry on this claim of error is whether the trial court abused that discretion—that is, whether its discretionary decision resulted in a manifest miscarriage of justice. (*Estate of Gilkison* (1998) 65 Cal.App.4th 1443, 1448-1449 [to obtain relief from an alleged abuse of discretion, an appellant must clearly establish a resulting injury sufficiently grave as to amount to a manifest miscarriage of justice].)

Sylvia's theory of prejudice or manifest injustice is that she was deprived of a favorable presumption about community property by the trial court's decision. We conclude the favorable presumption was overcome by the evidence--the most important item being the antenuptial agreement--and not because the trial court recharacterized Sylvia's petition.

In the present case, Sylvia's petition required the trial court to decide the community property questions raised by her claims. The trial court had to decide those

38.

questions *before* it decided whether to treat the petition as one filed under section 850. If the court had decided that community property came into existence during the marriage and Larry's probate estate held some of that community property, then the determination of how that property would pass could have continued under section 13650. Once the court determined the presumption about community property had been rebutted by the antenuptial agreement and there was no community property in the estate, the court had to decide what to do with Sylvia's claims to assets as her separate property. Based on this sequence of the trial court's determinations, it follows that it was not the recharacterization of the petition that deprived Sylvia of any presumption about community property. Instead, Sylvia lost the community property issue based on the evidence presented, including the terms of the antenuptial agreement. Therefore, we conclude that the harm asserted by Sylvia did not result from the trial court's decision to resolve her claims to separate property after it decided the community property issues. Accordingly, no prejudice or manifest miscarriage of justice has been established.

B.     Separate Property Reimbursement

1.     *Sylvia's Contentions*

Sylvia contends the trial court's ruling on separate property reimbursement was error. The attachment to the judgment states:

> "Fifth, prior to the court's tentative ruling Sylvia argued that she was entitled to reimbursement of her separate property contributions to the acquisition of property during the marriage pursuant to Family Code section 2640, subdivision (b). Sylvia apparently concedes that [Family Code s]ection 2640 is not applicable to this proceeding. The plain language of [Family Code] section 2640 and its location in a division of the Family Code regarding division of property indicate that [Family Code] section 2640 applies only to the division of assets in marital dissolution proceedings."

Sylvia's opening brief refers to the first sentence of this quoted paragraph and states that her "petition made no such request." Sylvia contends the issues her petition

39.

presented to the court were limited, but "[i]nstead the court provided a ruling which is now res judicata on an issue never raised. This creates a claim preclusion issue. Sylvia can no longer claim reimbursement for her separate property contributions to Larry's home. This was error and must be reversed." Sylvia's arguments about res judicata and claim preclusion appear to be an attempt to establish prejudice resulting from the error of addressing a claim never asserted in her petition.

### 2. *Substance of the Ruling*

We interpret the trial court's judgment to mean that, to the extent Sylvia asserted a claim for reimbursement pursuant to Family Code section 2640, such a claim lacked merit because that particular statute applied in marital dissolution proceedings and did not apply in a probate proceeding. Sylvia appears to disagree with this interpretation. Her arguments about res judicata and claim preclusion interpret the court's judgment much more broadly, suggesting that the trial court ruled against reimbursement on *all* grounds.

We conclude that Sylvia has failed to establish *prejudicial* error. The essential elements for claim preclusion are (1) a claim or issue raised in the present action is identical to a claim or issue litigated in a prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and (3) the party against whom the doctrine is being asserted was a party or in privity with a party to the prior proceeding. (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797.) In addition, the doctrine of issue preclusion (i.e., direct and collateral estoppel) requires the following elements:

> "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.]" (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.)

40.

Both claim and issue preclusion require the issue in question to have been actually litigated earlier. An issue has been actually litigated in a prior proceeding if it was properly raised, submitted for determination, and determined in that proceeding. (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 511.) Here, the narrow issue decided by the trial court was that Family Code section 2640 did not apply in the proceeding before it and, therefore, Sylvia was not entitled to reimbursement *pursuant to that section*. The court did not state or imply it was deciding the broader question of whether Sylvia had any other grounds for seeking reimbursement. Therefore, Sylvia has not demonstrated that the broader reimbursement issue was actually litigated and, as a result, she would be subject to California's claim and issue preclusion doctrines. Indeed, the argument presented by Sylvia does not identify the elements of claim preclusion or issue preclusion and attempt to demonstrate that those elements were satisfied in this case. Furthermore, Sylvia's argument is internally inconsistent. If she correctly asserts that she never raised the reimbursement issue under Family Code section 2640 that was addressed by the trial court, it follows that that particular reimbursement issue was not actually litigated in the earlier proceeding and there is no res judicata or claim preclusion.[11]

Therefore, assuming the paragraph in the judgment addressing reimbursement under Family Code section 2640 was erroneous because Sylvia made no such claim, we conclude that the error was harmless.

---

[11] The only reference to Family Code section 2640 that we have located in the papers Sylvia filed in the trial court is in a section of her February 2010 brief concerning the effect of the valid antenuptial agreement and possible transmutation of disputed property. In that section, Sylvia argued that, where funds are commingled and impossible to trace, the whole will be treated as community property and the estate had the burden of keeping records adequate to establish the character of an asset acquired with commingled funds.

VIII.   EVIDENTIARY ISSUES—RELEVANCE AND PREJUDICE

A.      Sylvia's Contentions

Sylvia contends the trial court erred by allowing the introduction of irrelevant and prejudicial evidence over her objections.  The challenged evidence related to the divorce of Sylvia's son, the child support orders from that divorce, and her son's renting the Manteca house after he purchased it from Sylvia—evidence that Sylvia contends had nothing to do with the characterization of assets listed in her petition.  In addition, Sylvia argues:

> "Mick was allowed to make allegations that Sylvia helped her son defraud his ex-wife, and that she somehow stole hundreds of thousands of dollars from Larry during the marriage.  [Transcript citations.]  By allowing irrelevant, immaterial and prejudicial evidence, the court forced Sylvia to try and refute those allegations.  Failing to grant timely objections lead to this decision that is neither equitable, supported by law, or substantial evidence.  This was error."

Sylvia also argues the court's improper evidentiary rulings resulted in prejudice because, but for the introduction of the improper and irrelevant evidence, the court had no basis for awarding attorney fees and costs.

B.      Legal Principles

1.      *Statutory Provisions Governing Relevance and Prejudice*

"No evidence is admissible except relevant evidence."  (Evid. Code, § 350.) "Relevant evidence" is defined as "evidence, *including evidence relevant to the credibility of a witness* or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210, italics added; see Evid. Code, § 780 [fact finder may consider matters relevant to truthfulness of witness's testimony].)

The admissibility of relevant evidence is subject to various statutory exceptions. (Evid. Code, § 351; see e.g., Evid. Code §§ 952 [lawyer-client privilege], 1060 [trade secret privilege], 1200 [hearsay].)  Another exception to the admissibility of relevant

evidence is set forth in Evidence Code section 352, which vests the trial court with discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The weighing process under this section involves the trial court's consideration of the unique facts and issues of the case rather than hard and fast rules. (*Aguayo v. Crompton & Knowles Corp.* (1986) 183 Cal.App.3d 1032, 1038.)

The "undue prejudice" mentioned in Evidence Code section 352 refers to evidence which uniquely tends to evoke an emotional bias against the party as an individual and which has very little effect on the issues—it is not synonymous with "damaging." (*People v. Karis* (1988) 46 Cal.3d 612, 638.) In general, evidence is substantially more prejudicial than probative if it poses an intolerable risk of the fairness to the proceedings or the reliability of the outcome. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.)

### 2. Standard of Review

Appellate courts apply the abuse of discretion standard when evaluating rulings regarding relevancy under Evidence Code section 210 and undue prejudice under Evidence Code section 352. (*Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 147.) When weighing probative value against the danger of prejudice, a trial court is deemed to have abused its discretion if its decision was arbitrary, capricious, or patently absurd and resulted in a manifest miscarriage of justice. (*Id.* at p. 150.)

### C. Relevancy and Prejudicial Effect

Sylvia has not carried her burden of showing the trial court abused its discretion when it admitted the challenged evidence because she has not established the evidence was irrelevant or unduly prejudicial.

The challenged evidence was relevant in two ways. First, the trial court's ruling that Larry and Sylvia had only separate property and no community property made the

sources and uses of money during the marriage of Larry and Sylvia relevant to the disputes over the ownership of the vehicles and other assets. Therefore, evidence about Sylvia's financial dealings with her son during the course of her marriage to Larry were relevant to identifying the source of funds in accounts held in Sylvia's name. Second, the evidence also related to her credibility and the credibility of her son. Evidence Code section 210 specifically identifies evidence relating to the credibility of a witness as relevant. Therefore, the trial court correctly overruled Sylvia's relevancy objections.

As to undue prejudice, we begin by identifying the decision maker who Sylvia contends was swayed by emotional bias. In this case the trial court, not a jury, acted as the trier of fact, which makes it more difficult to establish that the trier of fact's evaluation of the evidence was swayed by emotional bias. For example, in *People v. Weaver* (2012) 53 Cal.4th 1056, our Supreme Court evaluated the impact of a prosecutor's purportedly improper comments during closing argument by stating: "Moreover, this was a *court* trial. There was no jury to be misled." (*Id.* at p. 1077.) The difference between jury trials and court trials was mentioned by the trial judge in this case when he addressed objections to Brown's testimony by telling counsel, "there's not a jury. This is a court trial. The Court can sift through it." Based on our evaluation of the trial court's written decision, the court's oral statements during the proceedings, and the evidence presented, we conclude that the trial court did not misuse the evidence in its evaluation of the credibility of Sylvia and her son or in identifying the sources and uses of funds handled by Sylvia during the marriage.

In addition, we reject Sylvia's claim that without the contested evidence, the trial court had no basis for its order stating Mick was entitled to an award of reasonable attorney fees and costs. The trial court could have found that Sylvia acted in bad faith in this proceeding on any number of grounds, such as the concealment of the existence of the antenuptial agreement and subsequently testifying untruthfully about it.

44.

In summary, we conclude the challenged evidence was relevant and its admission did not result in a manifest miscarriage of justice.  (See *Donlen v. Ford Motor Co.*, *supra*, 217 Cal.App.4th at p. 150.)

IX.    ATTORNEY FEES

A.    The Award of Attorney Fees and Costs

*1.    Trial Court's Determinations*

The trial court found that Sylvia and her son "unabashedly testified at trial about financial schemes involving unrecorded cash transactions, manipulation of multiple bank accounts, shifting of assets and potential money laundering, tax evasion, perjury, and conspiracy to hide marital assets in dissolution proceedings."  The judgment stated that, based on this finding, Mick was entitled to reasonable attorney fees and costs pursuant to section 859 and Welfare and Institutions Code section 15657.5.  The appellate record does not contain a postjudgment order or amended judgment specifying the amount of reasonable attorney fees.

*2.    Section 859*

Section 859 provides that "a person [who] has in bad faith wrongfully taken, concealed, or disposed of property … belonging to … the estate of a decedent" may, in the court's discretion, be liable for reasonable attorney's fees and costs.[12]

---

[12]    We note that the attorney fees provision in section 859 was added by Stats. 2013, chapter 99, section 1 (Assem. Bill No. 381).  Sylvia's appellate briefing does not challenge the retroactive application of the attorney fees provision in section 859 to this case, perhaps because the matter was pending in the trial court when the amendment became effective.  (See *Olson v. Hickman* (1972) 25 Cal.App.3d 920, 922 [new attorney fees statute applied to pending case]; 1 Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 3d ed. 2015) § 2.6, p. 2-9 ["Statutes that add or amend provisions for attorney fees are almost always applied to pending cases"]; see generally, 58 Cal.Jur.3d (2012) Statutes, §§ 32-37, pp. 417-426 [retroactive effect of statutes].)

### 3. Elder Abuse Protections

California's Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600, et seq.) addresses financial and physical abuse of elders. The legislation defines an "elder" as a person who resides in California and is 65 years of age or older. (Welf. & Inst. Code, § 15610.27.) Welfare and Institutions Code section 15610.30, subdivision (a)(1) states that "financial abuse" of an "elder" occurs when a person "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both."

The second statutory ground for the trial court's determination that Mick was entitled to recover attorney fees was subdivision (a) of Welfare and Institutions Code section 15657.5, which provides:

> "Where it is proven by a preponderance of the evidence that a defendant is liable for financial abuse, as defined in [Welfare and Institutions Code s]ection 15610.30, in addition to compensatory damages and all other remedies otherwise provided by law, the court shall award to the plaintiff reasonable attorney's fees and costs. The term 'costs' includes, but is not limited to, reasonable fees for the services of a conservator, if any, devoted to the litigation of a claim brought under this article."

### B. Appealability of Award of Attorney Fees

Mick contends that the attorney fees portion of the judgment is not yet subject to appeal because the trial court has not determined the amount of the award. Mick cites *P R Burke Corp. v. Victor Valley Wastewater Reclamation Authority* (2002) 98 Cal.App.4th 1047 (*Burke*) for the principle that "if a judgment determines that a party is entitled to attorney's fees but does not determine the amount, that portion of the judgment is nonfinal and nonappealable." (*Id*. at p. 1054.) Applying this principle, the court concluded that it could not review the determination awarding reasonable attorney fees, but it would be able to review the entitlement to fees as well as the amount of those fees in an appeal from a postjudgment order specifying the amount of the award. (*Id*. at p. 1055.)

We conclude *Burke* accurately sets forth the law regarding the appealability of judgments and orders addressing a party's entitlement to attorney fees. Based on the record before this court, we conclude Sylvia's challenge to the portion of the judgment stating Mick is entitled to recover attorney fees is premature. The matter of attorney fees may be challenged in a subsequent appeal after the trial court has determined the amount of the fees to be recovered.

## DISPOSITION

The judgment is affirmed. Respondent shall recover his costs on appeal.

_____
FRANSON, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
KANE, J.

47.